IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **William Frank King, Jr.**, | ) | |
| | ) | |
| Plaintiff, | ) | CASE No. 2:13-cv-0009 |
| | ) | SENIOR JUDGE NIXON |
| vs. | ) | MAGISTRATE JUDGE BROWN |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| Defendant. | | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

### Report and Recommendation

This action was brought under 42 U.S.C. §§ 405(g) to obtain judicial review of the final decision of the Social Security Administration ("SSA") upon an unfavorable decision by the SSA Commissioner ("the Commissioner") regarding plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") 42 U.S.C. §§ 416(i), 432(d), and for benefits under Title XVI of the Supplemental Social Security Income Act ("SSI") 42 U.S.C. §§ 416(i), 1382(c). For the reasons explained below, the undersigned **RECOMMENDS** that the Plaintiff's motion for judgment on the record be **DENIED**, the Defendant's motion for judgment on the record be **GRANTED**, and the ruling of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

William Frank King, Jr. ("Plaintiff") filed for DIB under Titles II & XVI of the Social Security Act, 42 U.S.C. §§ 416(i) and 1382(c), on December 11, 2009. (Administrative Record ("A.R."), Docket Entry ("DE") 11, pp. 102-16.) Plaintiff claimed DIB based upon the adverse

effects of having an aortic valve replacement and high blood pressure (A.R., DE 11, p. 132.), but conditions of hypertension, peripheral vascular disease, and a spinal impairment were considered as part of the Commissioner's ultimate determination. (A.R., DE 11, p. 16.) Plaintiff's request was denied on March 16, 2010 and upon reconsideration on June 24, 2010. (A.R., DE 11, pp. 57-68.) Plaintiff's requested a hearing before an Administrative Law Judge ("ALJ") which was conducted before Douglas J. Kile on August 4, 2011. (A.R., DE 11, p. 37) Present for the hearing were Plaintiff, his attorney David Downard, and vocational expert ("VE") Dr. J. D. Flynn. (A.R., DE 11, p. 14.)

The ALJ denied Plaintiff's application for DIB on September 6, 2011 and Plaintiff requested review of the ALJ's determination on October 24, 2011. (A.R., DE 11, pp. 7-10, 11-22.) The SSA Appeals Council denied review of the ALJ's determination on December 6, 2012, rendering the ALJ's decision the Commissioner's final determination at that time. (A.R., DE 11, pp. 1-6.)

The plaintiff brought this action in district court on February 1, 2013 seeking judicial review of the Commissioner's decision. (DE 1.) The defendant filed an answer and a copy of the administrative record on April 22, 2013. (DE 10, 11.) On September 5, 2013, the plaintiff moved for judgment on the administrative record (DE 15), to which the Commissioner filed a response on October 16, 2013. (DE 19.)

This matter is properly before the court.

## II.    THE RECORD BELOW

### A.  Medical Evidence

Plaintiff underwent heart surgery in 2000 to have an aortic valve replacement. (A.R., DE 11, p. 205.) On April 3, 2003, Plaintiff's cardiologist, Dr. Paul Liccini, reported that although

Plaintiff complained of chest pain, he had experienced no adverse effects from the valve replacement, was able to work installing plaster and stucco, and any chest pain was "clearly non-cardiac and was probably musculoskeletal." (A.R., DE 11, p. 211.) Dr. Liccini prescribed "30 more Darvocets" for pain. (A.R., DE 11, p. 211.) In April of 2004, Plaintiff experienced a "pop" in his chest while attempting to lift a 180 pound fish tank, and, upon arriving at the emergency room, he complained of chest pain but denied dyspnea,[1] either at rest or upon exertion, and advanced "[n]o other complaints at all." (A.R., DE 11, p. 288.) The emergency room physician prescribed Percocet for pain and sent Plaintiff home. (A.R., DE 11, p. 289.)

Subsequently, Plaintiff continually complained of pain in his chest that he characterized as being stuck with a pin. (A.R., DE 11, p. 211.) These complaints occurred throughout 2003 and 2004 during emergency room visits for injuries sustained while preparing for a hurricane, from falling off of a scaffold, and from lifting his daughter who weighed 40 pounds. (A.R., DE 11, pp. 273-77,281-85.) Any discomfort reported by Plaintiff was "positional and [was] not worse with exertion" and any shortness of breath was "[a]ssociated with quick movement not exertion . . . [but r]esolve[d] very quickly." (A.R., DE 11, pp. 205, 798.)

Dr. Liccini, as did other treating physicians in Tennessee after Plaintiff moved there, observed that the pain complained of by Plaintiff was accompanied by tenderness and swelling above the sternum, and concluded that the pain was attributable to a wire placed around Plaintiff's sternum during the valve replacement in 2000. (A.R., DE 11, p. 210, 249, 250, 254, 268, 273, 282, 285, 288-89.) This pain was treated from 2003 through 2006 with a variety of pain medications. (A.R., DE 11, pp. 206, 210, 211, 274, 277, 282, 284, 289.) There is no

---

[1] Dyspnea is defined as "breathlessness or shortness of breath; difficult or labored breathing." Dorland's Illustrated Medical Dictionary 582 (32nd Ed. 2012).

mention of chest pain after March of 2006 when Plaintiff was referred to a cardiovascular surgeon to have the wire removed. (A.R., DE 11, pp. 254, 314.)

According to Plaintiff's cardiologists, other than the pain attributable to the sternum wire, Plaintiff experiences no adverse limitations from the heart valve replacement. Medical tests reveal no physical or exertional limitations from the heart valve replacement. (A.R., DE 11, pp. 205-16, 254-72, 275, 278-80, 286-87, 297-99, 311-14, 667-69, 673-74, 895-97, 901-02, 949-962, 1021, 1062.) While Plaintiff complained of shortness of breath in May and June of 2010, a heart catheterization procedure revealed only mild regurgitation and no adverse arterial angiography. (A.R., DE 11, pp. 798, 952-53, 1033.) As recently as March of 2011, Doctors at the Tennessee Heart, PLLC noted that Plaintiff was stable, "continues to do well," and experienced only mild regurgitation from the prosthetic valve.[2] (A.R., DE 11, p. 1021-24.) Other than Plaintiff's complaints in 2010 and those concerning the sternum wire, he has consistently denied chest pain, shortness of breath, or any other symptom of heart problems subsequent to the heart valve replacement.[3]

In addition to the issues stemming from heart valve replacement surgery, Plaintiff has been treated for pain management with "chronic narcotic therapy," likely due to a myriad of injuries. (A.R., DE 11, pp. 474, 1033.) In addition to injuries sustained in Florida prior to 2005, Plaintiff was involved in many mishaps subsequent to his move to Tennessee at the end of 2004 or the beginning of 2005. On each occasion, Plaintiff's primary care physicians prescribed painkillers—Ultram and hydrocodone—to alleviate the pain.

---

[2] Regurgitation is "the backflow of blood from the aorta into the left ventricle" of the heart due to the placement of the valve. Dorland's Illustrated Medical Dictionary 1621 (32nd Ed. 2010).

[3] *See* A.R., DE 11, pp. 205, 220, 225, 319, 324, 330, 357, 362, 368, 374, 379, 383, 391, 395, 398, 402, 428, 432, 438, 441, 445, 448, 452, 464, 471, 488, 493, 507, 510, 514, 519, 524, 530, 537, 540, 545, 549, 553, 557, 562, 566, 570, 575, 579, 584, 588, 597, 602, 606, 609, 613, 617, 623, 626, 630, 633, 637, 657, 663, 670, 681, 684, 687, 692, 698, 784, 802, 814, 825, 841, 846, 885, 898, 909, 912, 915, 920, 926, 933, 938, 942, 945, 1009, 1017.

In July of 2005, Plaintiff reported right arm pain after striking himself with a 25 pound hammer while attempting to drive a fence post into the ground (A.R., DE 11, pp. 245.), and back pain after driving his lawn mower off of the back of his truck. (A.R., DE 11, p. 246.) In August of 2005, Plaintiff reported "chronic" back pain from driving a tractor for a living and chest pains after a refrigerator fell onto his chest. (A.R., DE 11, p. 245.) X-rays, however, revealed nothing serious. (A.R., DE 11, p. 245.) In September, Plaintiff reported hip and chest pain subsequent to a fall, but X-rays were again unremarkable. (A.R., DE 11, p. 244.) In October, Plaintiff reported that his arm was injured by a branch when he attempted to push it out of the way while riding his lawn mower. (A.R., DE 11, pp. 233, 243, 501.) Plaintiff's right shoulder was injured in November when a board fell onto it at work. (A.R., DE 11, pp. 230, 498.) Plaintiff was involved in a motor vehicle accident in December that aggravated his injuries from September. (A.R., DE 11, pp. 225, 493.)

In January of 2006, Plaintiff reported that he was experiencing pain from a fall in which he had broken his tailbone. (A.R., DE 11, p. 220.) Plaintiff's primary care physicians did not order X-rays to confirm Plaintiff's claims, but X-rays taken in October of 2006 and April of 2007 show no signs of a past fracture to Plaintiff's tailbone. (A.R., DE 11, pp. 404-14, 975-79.) Plaintiff again reported lower back pains in March of 2006 after being involved in another motor vehicle accident. (A.R., DE 11, p. 323.) Plaintiff's chronic back pain was further aggravated by riding his lawn mower in April of 2006 (A.R., DE 11, p. 321), and in July when a cow apparently pinned Plaintiff against a fence. (A.R., DE 11, pp. 351, 391, 537.) X-rays after the July incident were unremarkable. (A.R., DE 11, pp. 351, 391, 537.)

An 80 pound gate fell on Plaintiff in September of 2006 injuring his right foot and shoulder. (A.R., DE 11, pp. 980-86.) X-rays performed at the time reveal "no acute traumatic

5

abnormality" but showed "mild arthritis in the right clavicle." (A.R., DE 11, pp. 980-86.) Plaintiff reported lower back and tail bone pain after a fall in October , but X-rays taken after the incident were unremarkable. (A.R., DE 11, pp. 975-59.) In November of 2006, while playing football, Plaintiff was tackled by a 240 pound individual. (A.R., DE 11, p. 971.) Afterward, Plaintiff reported injuries to his right arm, but X-rays revealed no breaks or changes since the cow incident in July. (A.R., DE 11, pp. 973-74.) Plaintiff continued to receive pain medications for "chronic" pain during the remainder of 2006. (A.R., DE 11, pp. 374, 379, 545-49, 562-69, 969-74.)

In January of 2007, Plaintiff reported head and neck pain after being hit by a large limb while riding a tractor. (A.R., DE 11, pp. 372, 422-23, 557, 584.) X-rays and a CT performed on January 15th revealed no issues with soft tissue or cervical alignment but reflected "mild degenerative changes [and n]o acute irregularities" in the cervical spine. (A.R., DE 11, pp. 422-23.) In March, Plaintiff reported back pain and bruising due to a slip and fall. (A.R., DE 11, pp. 588-90.) Plaintiff reported, yet again, pain stemming from injuries to his tail bone after falling off of his truck in April. (A.R., DE 11, pp. 404-14, 453, 637.) X-rays taken revealed no evidence of past or current breaks or showed any changes from X-rays taken after the January 2006 incident. (A.R., DE 11, pp. 404-14.)

In May, Plaintiff reported to an emergency room triage nurse that he had been run over by his lawn mower after falling off of it. (A.R., DE 11, pp. 963-66.) The nurse noted, however, that Plaintiff was able to "ambulate[] well." (A.R., DE 11, p. 964.) In July of 2007, for the first time since his heart valve replacement, Plaintiff reported right leg numbness and pain that had persisted since the 2000 surgery. (A.R., DE 11, pp. 441-626.) In September, Plaintiff reported pain from a "stretched" anterior cruciate ligament (A.R., DE 11, p. 609), and severe pain and

bruising after dropping a 40 pound grate on his right foot and ankle in October. (A.R., DE 11, pp. 606, 942.)

Remarkably, from November of 2007 through December of 2008 Plaintiff reported no pain stemming from fresh injuries. However, Plaintiff continued to receive prescription pain medications for "chronic" pain each and every month. (A.R., DE 11, pp. 648-701, 876-935.) Eventually, on March 4, 2009, Plaintiff signed a pain management contract with his primary care physician and continued to receive regular prescriptions for pain medications due to "chronic" back pain until May of 2010. (A.R., DE 11, pp. 798-935.) Despite Plaintiff's good luck over the prior fourteen months, Plaintiff reported lower back pains from a slip and fall in January of 2009 that aggravated the broken tail bone Plaintiff claimed to have suffered three years prior. (A.R., DE 11, pp. 716-23.) X-rays performed at that time revealed "[m]inimal degenerative changes [to] the lower thoracic and lumbar spine [and] . . . normal [d]isk spac[ing]." (A.R., DE 11, p. 722.)

In July of 2009, Plaintiff reported neck pain after running his lawn mower into a ditch. (A.R., DE 11, pp. 731-39, 845.) In December of 2009, Plaintiff slipped on some ice and fell (A.R., DE 11, pp. 777-82.), and, subsequently, injured his leg on a trailer. (A.R., DE 11, pp. 768-74.) In August of 2010, Plaintiff reported injuries to his foot that were sustained while mounting his lawn mower, but X-rays revealed no break in the bone and only "mild degenerative joint disease." (A.R., DE 11, 1041-54.) During his August visit to the emergency room, Plaintiff advanced no complaints of dizziness or shortness of breath, and the intake report shows that Plaintiff's blood pressure was 140/84 and his pulse was 75. (A.R., DE 11, p. 1041-54.) In May of 2011, Plaintiff reported to an emergency room triage nurse that he had injured his back while bending over to pick up a wooden bear. (A.R., DE 11, 1063-78.)

On July 25, 2011, Dr. Chad Canaster submitted a Medical Source Statement (MSS) detailing severe limitations imposed by Plaintiff's heart valve replacement and chronic back pain stemming from a bulging disc. (A.R., DE 11, pp. 1079-84.) According to Dr. Canaster, Plaintiff may only lift or carry 10 pounds occasionally and may never lift or carry more than that. (A.R., DE 11, p. 1079.) Further, Plaintiff must alternate sitting, standing, or walking for fifteen minutes at a time and, combined, may only do each activity for a total of two hours in an eight hour day. (A.R., DE 11, p. 1080.) A bulging disc in Plaintiff's lumbar spine limits Plaintiff to occasional use of his hands and feet in work related activities (A.R., DE 11, p. 1081.), and the limitations from valve replacement surgery prevent him from working in most positional attitudes and environments. (A.R., DE 11, p. 1082.)

Despite Dr. Canaster's MSS, Plaintiff completed a fatigue questionnaire and a disability report stating that he was able to care for his daughter and help with her homework, go for walks with her and occasionally throw a football with her, cook meals two or three times a week, clean house for an hour every other day, cut grass on a lawn mower every other week, shop for food and household items once or twice a month for 2 to 3 hours at a time, attend swap meets at a local flea market or shop in a thrift store, and perform some household and automotive repairs. (A.R, DE 11, pp. 148-49, 158-67.)

### B. DDS Expert Opinions

SSA's medical expert, Dr. Darrell M. Caudill M.D. ("Dr. Caudill"), completed a residual functional assessment of Plaintiff in March of 2010. (AR pp. 320-31) Dr. Caudill found, based upon the longitudinal history presented in the record, that Plaintiff's medical conditions placed some exertional and postural limitations upon him but no manipulative or visual limitations. (A.R., DE 11, pp. 785-93.) According to Dr. Caudill, Plaintiff can occasionally lift up to 50

pounds, frequently lift 25 pounds, and can sit, stand and/or walk for about six hours in an eight hour day with normal breaks. (A.R., DE 11, p. 790.) Further, Plaintiff can climb stairs, balance, stoop, kneel, crouch, and crawl frequently but may only climb ladders, ropes, or scaffolds occasionally. (A.R., DE 11, p. 787.)

On June 22, 2010, Dr. Frank R. Pennington M.D. confirmed Dr. Caudill's findings, even in light of Plaintiff's claims of worsening conditions. (A.R., DE 11, p. 948.) Central to Dr. Pennington's assessment was the fact that Plaintiff had denied chest pains, palpitations, syncope, dyspnea on exertion, and orthopnea in May of 2010, and that Dr. Caudill's findings were consistent with the findings of Plaintiff's treating physicians included in the record. (A.R., DE 11, p. 948.)

**C. Testimonial Evidence**

1. *Plaintiff's Testimony*

Plaintiff testified that he was fifty-two years of age at the time of the hearing, has a high school education, and, thus, can read, write, add, and subtract. (A.R., DE 11, p. 30.) Plaintiff also possesses a driver's license but can drive only short distances before he has to stop and pull over. (A.R., DE 11, p. 30, 36.) Plaintiff testified on four separate occasions that he has been unable to work or to engage in any of his prior hobbies such as hunting, fishing, baseball, or football since December of 2004. (A.R., DE 11, pp. 31, 35.) As a result, Plaintiff's typical day is spent either sitting or lying in front of the television. (A.R., DE, 11, p. 34.)

The predominant reason for Plaintiff's inability to work or engage in his past hobbies is the side effects of an aortic valve replacement in 2000. (A.R., DE 11, p. 32.) The blood thinner that he takes due to the prosthetic heart valve causes him to bleed excessively and bruise easily. (A.R, DE 11, p. 32.) He has a rapid heart rate and experiences shortness of breath and dizziness

9

"after standing too long or moving too much." (A.R., DE 11, p. 32.) According to his primary care physician, "Dr. Chad Hancer" (sic), Plaintiff is restricted from lifting more than 10 pounds, sitting or standing for more than two hours over an eight hour period, and prohibited from reaching over head. (A.R., DE 11, p. 33.) Further, Plaintiff claims that he can walk no more than 15-30 minutes before becoming dizzy and light headed. (A.R., DE 11, p. 34.) A bulging disc in his back, according to Plaintiff, causes him difficulty bending, kneeling, or squatting. (A.R., DE 11, p. 34.)

    2. *Vocational Expert's Testimony*

The ALJ posed the following hypothetical to the VE for his assessment:

> assume that on the basis of the claimant's record performing any of the claimant's exertional impairments, the claimant's residual functional capacity, or a wide range of light work on a sustained basis. Assume that [Plaintiff has] demonstrated certain significant, non-exertional impairments physically relating to a[] heart impairment, hypertension, peripheral cardio vascular disease, and spinal impairments. Zoning the inability to work with heights or around moving dangerous machinery, inability to handle the exposure of excessive dusts, smoke, fumes, and obnoxious gases. Inability to handle excessive vibration, inability to perform frequent squatting, inability to operate foot controls on a frequent basis. Inability to perform frequent overhead motions, and the inability to perform frequent bending and stooping. Taking into full account these non-exertional restrictions and the claimant's age and education and prior work experience, are there jobs existing in the general area that the claimant is [INAUDIBLE] that he could perform with these limitations?

(A.R., DE 11, p. 39-40.)

In response, the VE testified that Plaintiff could find light duty work as a fast food worker, cafeteria attendant, or as a cashier. (A.R., DE 11, p. 40.) The VE also stated that environmental concerns, such as temperature and humidity, mild to moderate pain, and slight to moderate fatigue would have no bearing on the vocational assessment. (A.R., DE 11, pp. 40-43.) Additionally, the vocations identified by the VE would permit no more than two absences per month and only three breaks during a typical work day, and the inclusion of a sit/stand options

10

would eliminate all light duty jobs. (A.R., DE 11, pp. 41-42.) The VE also testified that a person who suffered from the severe symptoms reported by Plaintiff would be unable to find work on a sustained basis in either the Tennessee or National economy. (A.R., DE 11, p. 43.)

## III. ANALYSIS

### A. Standard of Review

The District Court's review of the Commissioner's denial of DIB is limited to a determination of whether those findings are supported by substantial evidence and whether correct legal standards were applied. 42 U.S.C. § 405(g); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). A finding of substantial evidence does not require all the evidence in the record to preponderate in favor of the ALJ's determination, but does require more than a mere scintilla of support for a denial of DIB. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ's determination is entitled to deference where "a reasonable mind might accept [evidence in the record] as adequate to support" the ALJ's determination even though it could also support a different conclusion. *Rogers*, 486 F.3d at 241; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "[F]ailure to follow the rules" promulgated to control the process of benefit determination "denotes a lack of substantial evidence, even where the ALJ's" determination is otherwise supportable. *Cole*, 661 F.3d at 937 (*quoting Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

### B. Assignments of Error

Plaintiff asserts that the ALJ's decision to deny his claim to DIB was in error because the ALJ failed to afford controlling weight to the opinion of Dr. Chad Canaster, and the ALJ's finding that Plaintiff has a residual functional capacity ("RFC") permitting light work is not supported by substantial evidence.

1. **Weight afforded to the opinion of Dr. Chad Canaster**

   As to the opinion of Dr. Chad Canaster, the ALJ found:

   Dr. Chad Conaster, MD submitted a residual functional capacity assessment on July 25, 2011. This doctor opined the claimant is limited to sedentary exertion; he can only lift 10 pounds occasionally and never more than 10 pounds. The opinion also contains severe walking, standing and sitting restrictions. The opinion states the claimant can never perform any postural movements at all. The undersigned gives this opinion little weight for several reasons. First, this physician admitted his opinion was based on "old records". Moreover, it is not clear if this physician examined or treated the claimant. It is not clear if this opinion relied solely on medical records in which case it would deserve no more weight than any other non-examining source. This opinion does not say how long the treating relationship (if any) was. Additionally, the severity of limitations in this opinion does not find support in the record.

(A.R., DE 11, p. 19.)

Plaintiff asserts that the ALJ's finding that Dr. Canaster is a "non-treating medical source" was in error. (Plaintiff's Brief in Support of Motion for Judgment on the Record ("Plaintiff's Br."), DE 16, p. 7.) According to Plaintiff, Dr. Canaster is Plaintiff's treating physician and his opinion is entitled to controlling weight. (Plaintiff's Br., DE 16, p. 7.) Further, because Dr. Canaster is a treating source, the ALJ's treatment of his opinion does not comport with Social Security Ruling 96-2p and the ALJ failed to state "good reasons" as to why that opinion was afforded less than controlling weight. (Plaintiff's Br., DE 16, p. 7.) In response, the Commissioner asserts that there is insufficient evidence in the record to support a finding that Dr. Canaster is a treating source and that Dr. Canaster's opinion is unsupported by the evidence of record. (Defendant's Response to Plaintiff's Motion for Judgment on the Record ("Defendant's R., DE 19, p. 17.)

The burden rests with Plaintiff to "prov[e] the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (citing *Bowen*

*v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *See also* 20 C.F.R. § 404.1520. As the Commissioner aptly notes, this burden extends to establishing the existence of an "ongoing medical treatment relationship with an acceptable medical source." 20 C.F.R. § 404.1502, *See Thompson v. Astrue*, No. 3:10-cv-01688, 2011 U.S. Dist. LEXIS 84542 at *30 (N.D. Ohio Aug. 2, 2011). A claimant meets this burden when he furnishes sufficient medical evidence to establish that the claimant "see[s], or ha[s] seen, the source with a frequency consistent with acceptable medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition." 20 C.F.R. § 404.1502. As the ALJ found, Plaintiff failed to meet this burden.

As the ALJ noted, there are no other treatment notes in the record to establish the "length, frequency, nature, and extent of the treatment relationship." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The only evidence of record attributable to Dr. Canaster is the MSS prepared on July 25, 2011, some eleven days prior to the hearing. (A.R., DE 11, 1084.) Dr. Canaster made no reference to independent medical findings or any specific objective medical evidence in support of his ultimate conclusion regarding the severity of Plaintiff's impairments other than "old records" as the ALJ stated. (A.R., DE 11, 1083.) Moreover, as the ALJ noted, the basis for Dr. Canaster's opinion is not supported by the evidence of record. As detailed *supra* at pp. 2-8, the record reveals no more than mild or minimal degenerative changes in Plaintiff's cervical or lumbar vertebrae and that Plaintiff's exertional limitations are not nearly as severe as even the ALJ found them to be.

Therefore, the Magistrate Judge finds substantial evidence to support the ALJ's finding that Dr. Canaster is not a treating source. As such, it is unnecessary to consider Plaintiff's claims that the ALJ failed to comply with SSR 96-2p or that he failed to provide "good reasons" for not affording Dr. Canaster's opinion controlling weight.

**2. The RFC assessed by the ALJ**

Plaintiff mounts two separate but interrelated attacks on the RFC assessed by the ALJ. First, Plaintiff asserts that the ALJ erroneously classified Plaintiff as a "younger individual" rather than one "closely approaching advanced age." (Plaintiff's Br., DE 16, p. 9.) As an individual who is "closely approaching advanced age," according to Plaintiff, had the RFC limited Plaintiff to sedentary work he would be disabled under Medical Vocational Rule 201.12 or 201.14. (Plaintiff's Br., DE 16, p. 9.) Plaintiff concedes that the objective medical evidence supports the ALJ's RFC assessment but asserts that the ALJ made no specific credibility finding in regard to Plaintiff's statements and cited no reasons for discounting Plaintiff's subjective complaints.[4] (Plaintiff's Br., DE 16, p. 9-12.)

In response, the Commissioner argues that the ALJ's classification of Plaintiff as a "younger individual" was a typographical error and that any error here is harmless. In order to access the grid rules under Medical Vocational Rule 201.12 or 201.14, the ALJ's RFC finding must limit Plaintiff to sedentary work. (Defendant's R., DE 19, p. 17.) According to the Commissioner, because the ALJ's credibility finding of Plaintiff's subjective complaints finds substantial support in the record, the ALJ's RFC finding that Plaintiff is capable of light work also finds substantial support in the record. (Defendant's R., DE 19, pp. 9-14.) Thus, Plaintiff's argument here is moot. (Defendant's R., DE 19, pp. 9-14.)

To substantiate entitlement to DIB under the SSI, a claimant must demonstrate "a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

---

[4] In the concluding sentence of Plaintiff's argument regarding the ALJ's misclassification of his age, Plaintiff simply asserts that "the claimant's testimony is supported by the treatment records and his RFC finding should have been less than sedentary at his AOD." (Plaintiff's Br., DE 16, p. 9.) Plaintiff did not allege that the objective medical evidence does not support the ALJ's RFC finding nor did he cite to any objective evidence of record that would refute the ALJ's finding that the Plaintiff can engage in light work.

months." 42 U.S.C. §§ 423(a)(1)(E), (d)(1)(A). Determination of a "disability" under the SSA's rules requires a five-step sequential assessment of whether: 1) a claimant has engaged in substantial gainful activity during the period under consideration; 2) the claimant has a severe medically determinable physical impairment that significantly limits his ability to do basic work activities; 3) the claimant has a severe impairment that meets or equals one of the listings in Appendix I Subpart P of the regulations and meets the durational requirements; 4) the claimant's impairment prevents him from doing her past relevant work; and, if so, 5) whether the claimant can transition to other work under the RFC. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), (b)-(g).

Similarly, step four of the process requires a graduated approach. The ALJ must first determine if the objective medical evidence of record demonstrates "the existence of a medical impairment which . . . could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529 (b). Next, where a medical impairment is found, the ALJ is required to assess the limiting effects imposed by that medical impairment or combination of impairments. 20 C.F.R. § 404.1529 (c). Where objective medical evidence demonstrates severe limitations, disability is proven conclusively.

However, whereas here, objective medical evidence fails to establish a medical impairment with severe debilitating effects, the ALJ is required to consider other evidence including subjective complaints of the claimant. 20 C.F.R. § 404.1520 (c)(2), SSR 96-7p. Where subjective complaints are evaluated, a credibility finding must be made based upon the case record as a whole. 20 C.F.R. § 404.1520 (c)(2), SSR 96-7p. Factors to be considered include: 1) a claimant's daily activities; 2) the purported location, duration, frequency, and intensity of the symptoms; 3) precipitating and aggravating factors; 4) medications prescribed to control symptoms and their effectiveness; 5) the effectiveness of treatments other than

medications on a claimant's symptoms; 6) any additional measures used to alleviate symptoms; and 7) any other relevant factors. 20 C.F.R. § 404.1529 (c)(3)(i)-(vii).

Contrary to Plaintiff's claims, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible," and his claims of "completely debilitating" symptoms "unpersuasive." (A.R., DE 11, pp. 18-19.) In addition to the contrary medical evidence cited in support of his finding, the ALJ offered:

> The claimant has described activities of daily living that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant helps cook dinner, helps daughter with homework and helps get her ready for school (Exhibit 7E). He reports no problems with personal care, and he can cook chicken, steak, spaghetti, French fries, sandwiches and vegetables about 2 or 3 times a week. He helps wash dishes; he mows the yard, and he does a few home repairs. He walks every day and he drives a vehicle. He pays bills, counts change, and can handle a checkbook and savings account. He enjoys reading, television and playing with his daughter. These do not seem to be the activities of a completely disabled individual. Moreover, as discussed above, the claimant's medications help to control the claimant's condition, pain and symptoms effectively. The objective evidence shows only mild or moderate findings.
>
> There are disturbing inconsistencies in the claimant's allegations. At the hearing, he testified he could only stand 2 hours a day or sit 2 hours a day, and he could walk 15-30 maximum. However, in a Fatigue Questionnaire and a Function Report (Exhibit 7E; 6E), he gave inconsistent answers. Moreover, he stated he had difficulty with bending, standing, squatting, and sitting at the hearing, but he did not indicate as much in his Function Report (Exhibit 7E).

(A.R., DE 11, p. 19.)

As detailed *supra* at pp. 9-10, the Magistrate Judge also notes that Plaintiff testified that his heart condition caused his most severe limitations and that his back pain poses minor postural concerns. According to Plaintiff, any exertion on his part causes shortness of breath and dizziness and has consistently prevented him from engaging in work related activities or any of his prior hobbies since December of 2004. However, as detailed *supra* at pp. 2-4, prior to filing his claim to DIB in December of 2009, Plaintiff consistently denied shortness of breath or

16

cardiac chest pains to his treating physician and cardiologist. Further, as detailed *supra* at pp. 4-7, prior to receiving pain medications on a consistent basis in 2008, Plaintiff engaged in a myriad of activities that are contrary to his claims of complete disability.

Plaintiff endeavored to lift a 180 pound fish tank, drive a fence post into the ground by striking it repeatedly with a 25 pound hammer, drive a tractor for a living, lift a refrigerator, lift boards at work while claiming disability that prevents work, work around livestock closely enough to be pinned between a cow and a fence, lift an 80 pound gate and a 40 pound grate, and, most notably, play full contact tackle football with individuals outweighing him by nearly 100 pounds.

The Magistrate Judge finds substantial evidence to support the ALJ's credibility finding. As such, the Magistrate Judge finds that the ALJ's RFC finding that Plaintiff can engage in light work is also supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the Magistrate Judge finds the ALJ's findings in regard to Dr. Canaster and Plaintiff's credibility to be supported by substantial evidence. Further, because Plaintiff is capable of light work, the Magistrate Judge finds any error associated with the ALJ's misclassification of Plaintiff's age is harmless.

## V. RECOMMENDATION

For the reasons stated above, the undersigned recommends that the plaintiff's motion for judgment on the record (DE 12) be **DENIED**, Defendant's motion for judgment on the record be **GRANTED**, and the ALJ's decision denying DIB be **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall

respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

       **ENTERED** this 23rd day of January, 2014.

       /s/Joe B. Brown
       Joe B. Brown
       Magistrate Judge